IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>KELLY RAY BARBER,<br><br>    Defendant. | No. CR12-3050<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

*I.*   *INTRODUCTION* .................................. 1

*II.*  *PROCEDURAL HISTORY* ............................ 2

*III.* *ISSUE PRESENTED* ............................... 2

*IV.*  *RELEVANT FACTS* ................................ 2

*V.*   *DISCUSSION* .................................... 5
       *A.*   *Probable Cause* .......................... 5
       *B.*   *Reasonable Suspicion* .................... 7

*VI.*  *RECOMMENDATION* ............................... 10

## *I. INTRODUCTION*

On the 17th day of January 2013, this matter came on for hearing on the Motion to Suppress (docket number 16) filed by the Defendant on December 28, 2012. The Government was represented by Assistant United States Attorney John H. Lammers. Defendant Kelly Ray Barber appeared in court and was represented by his attorney, John Dennis Jacobsen.

## II. PROCEDURAL HISTORY

On November 29, 2012, Defendant Kelly Ray Barber was charged by Indictment with one count of possession of methamphetamine with intent to distribute. At his initial appearance and arraignment on December 4, Defendant entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on January 28, 2013.

On December 28, 2012, Defendant timely filed the instant motion to suppress. The Government filed its resistance on January 4, 2013. Because of the pending motion, the trial has been continued to February 25, 2013, with a status hearing set on January 30.

## III. ISSUE PRESENTED

The sole issue presented in Defendant's motion to suppress is whether Defendant's Fourth Amendment rights were violated when officers stopped his vehicle on October 11, 2012.

## IV. RELEVANT FACTS

A little after 9:00 p.m. on October 11, 2012, Officer Joel Vandekrol of the Clear Lake Police Department was conducting surveillance in the City of Clear Lake. Vandekrol testified he was parked in his patrol car and surveilling another vehicle parked several blocks away "for a different case," when a vehicle pulled up near where Vandekrol was sitting. According to Vandekrol, it came through an alley with its lights off, took a right, and parallel parked on the street. His suspicions aroused, Vandekrol refocused his attention on the vehicle and a nearby house. According to Vandekrol, he was familiar with the house because the owner's name had "come up several times" regarding drug activity, including short term vehicle traffic. In fact, the Clear Lake police had done surveillance on the house on previous occasions.

Officer Vandekrol testified that he could not see how many people were in the vehicle when it initially pulled up. According to Vandekrol, he was 30 to 50 yards away, there were "no street lights anywhere close," and it was a "very shaded area." He observed two people get out of the vehicle and enter the house. According to Vandekrol,

2

they were wearing big winter coats with hoods, and baggie clothing. Vandekrol testified that he could not tell the gender of the people who got out of the vehicle, nor could he determine their age, height, or weight.

At that point, Officer Vandekrol drove his squad car past the vehicle to get the license plate. He ran it through the computer and it showed that the registered owner of the vehicle — a female — had a "surrendered" driver's license. According to Vandekrol, a surrendered license could mean they were forced to give it up by the DOT due to a medical condition, or they may have moved out of the state and obtained a driver's license in the other state. In any event, Officer Vandekrol repositioned his squad car so that he was able to watch the vehicle, but was out of sight of the house. He also called Officer Bengston on his cell phone and reported the suspicious activity. Vandekrol explained that it was common for officers to use a cell phone to avoid being heard by persons with police scanners. Officers Bengston and O'Keefe (who was riding with Bengston) then proceeded to the area.

At about the time Officers Bengston and O'Keefe arrived near the area, Officer Vandekrol saw brake lights come on and the vehicle begin to move back down the alley, again with its lights off. According to Vandekrol, it was "too dark from my position" to see the driver walk back out of the house, and he did not know how many people were in the vehicle at that point. The vehicle turned its lights on when it turned onto the paved street, and it was stopped by Officers Bengston and O'Keefe approximately three or four blocks from its original location. O'Keefe testified that prior to stopping the vehicle, Bengston "made a comment that he thought he saw a vehicle leaving down the alley way without any lights on."

According to Officer Vandekrol, he did not know who was driving the vehicle until it was stopped by Officers Bengston and O'Keefe. Similarly, O'Keefe testified that he did not determine a male was driving until after the vehicle was stopped, he approached the driver's window, and Defendant looked up at him. O'Keefe had passed the vehicle going

3

the other way before he turned around to stop it, but his attention was focused on the license plate to see if it was the right car. A video recording of the stop was introduced as Government's Exhibit 1. The video confirms that the driver's gender is not readily apparent — even after he gets out of the car — because of a heavy, loose-fitting coat, and a hood which extends beyond the person's face.

While Officer Vandekrol's police report apparently states that the vehicle left the area in the alley with its lights off, the officer conceded on cross-examination that it does not state that the vehicle also arrived at the house with its lights off.[1] Vandekrol, who had been a police officer for approximately 15 months prior to this incident, testified that "I don't mention every probable cause" when preparing his report. While Vandekrol believed that the vehicle driving off without lights constituted a traffic violation, he advised Officer O'Keefe on the radio that "there's no DL on file; so that's your PC if you want to go get 'em."[2]

Bret Palmer, the service manager at a local Chevy dealership, was called to testify as an expert witness by Defendant. Palmer testified that he checked the VIN number on the 1997 Chevy Lumina which was involved in the incident, and determined that it had an "automatic headlamp." That is, the headlights come on when the engine is running. According to Palmer, you cannot override the system, unless there is a mechanical problem. On further examination, however, Palmer agreed that some vehicles of this make and model have one light, while others have two bulbs. Palmer was unable to tell from the VIN whether the car being operated by Defendant had one light or two. On those cars which have both "running lamps" and "headlights," the running lamps are on all the time, with the headlights controlled manually by a switch. On cross-examination, Palmer

---

[1] The police report was not introduced as an exhibit at the hearing.

[2] It is difficult to tell from the recording whether Officer Vandekrol says "go get 'em," or "go get him." The Court believes the distinction is not significant.

testified that he "assumed" there was a fuse that controlled the running lights, and conceded it was "possible" that one could disable the running lights by pulling the fuse.

Frank Hodak, a Cerro Gordo County sheriff's deputy assigned to the North Central Iowa Narcotics Task Force, testified on rebuttal that when running covert operations, it was common for task force officers to disable a vehicle's daytime running lights. According to Hodak, on approximately ten occasions either he or a person at the dealership disabled the daytime running lights by pulling a fuse. This was done on a variety of makes and models. Hodak testified that he had personally disabled the running lights on a Chevy Trailblazer using this method, but he acknowledged on cross-examination that he had no knowledge regarding the Chevy Lumina.

## V. DISCUSSION

Defendant argues that the officers violated the Fourth Amendment when they stopped his vehicle. The Fourth Amendment protects against unreasonable searches and seizures. A traffic stop constitutes a seizure of the vehicle's occupant. *United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012). Accordingly, a traffic stop "must be supported by reasonable suspicion or probable cause." *Id.* at 706. "Reasonable suspicion" exists when the officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Id.* (quoting *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008)). Moreover, any traffic violation, however minor, provides probable cause for a traffic stop. *Id.* Accordingly, the Court must determine whether the facts known to the officers, "viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

### A. Probable Cause

The Government first argues that the officers had probable cause to believe the vehicle was being operated after dark without displaying lighted headlamps. Iowa law

requires that "[e]very motor vehicle upon a highway within the state, at any time from sunset to sunrise . . . shall display lighted headlamps. . . ." Iowa Code § 321.384(1). Defendant argues that an "alley" is not a "highway," and "there are zero requirements for the use of headlamps in an alley."[3]

The Iowa Code defines a "street" or "highway" as "the entire width between property lines of every way or place of whatever nature when any part thereof is open to the use of the public, as a matter of right, for purposes of vehicular traffic." Iowa Code § 321.1(78). It also defines an "alley" as "a thoroughfare laid out, established, and platted as such, by constituted authority." Iowa Code § 321.1(3). In his addendum, Defendant asserts that the Clear Lake city ordinances define an alley as "a public right-of-way, other than a street, affording secondary means of access to abutting property."[4]

Defendant apparently argues that because an "alley" is defined separately, it cannot also constitute a "highway" within the meaning of § 321.384(1). He provides no authority in support of his claim. As set forth above, Iowa law broadly defines a highway as "every way . . . of whatever nature" which is "open to the use of the public . . . for purposes of vehicular traffic." While an "alley" may be separately defined in the Iowa Code and the Clear Lake ordinances, it is clearly open to the public for purposes of vehicular traffic. Accordingly, the Court concludes that one driving in an alley between sunset and sunrise must display lighted headlamps, as required by Iowa Code § 321.384(1).

Defendant also argues that Officer Vandekrol's testimony is "called into question" by the failure to include in his police report the fact that Defendant arrived at the scene with his lights off. That is, while the report apparently states that the vehicle *left* the scene with its lights off, it does not make a similar reference to the *arrival* of the vehicle. In its supplemental brief, the Government concedes that "Vandekrol should have noted the

---

[3] Defendant's Addendum to Motion to Suppress (docket number 26) at 5.

[4] *Id.* at 5. (A copy of the ordinance was not provided to the Court.)

failure to have headlights on both occasions," but argues that there is "nothing inconsistent about his recollection."[5] The Court agrees. The Court found Vandekrol to be a credible witness. In his report — prepared shortly after the events — Vandekrol noted that the vehicle left the area with its lights off. Prior to the stop, Officer Bengston apparently made a comment to Officer O'Keefe that he "thought he saw a vehicle leaving down the alley way without any lights on." Vandekrol's failure to note in his report that the vehicle also arrived with no lights, does not make the testimony regarding the lack of lights when leaving any less credible.

In summary, the Court concludes the officers had probable cause to believe that the vehicle had been operated on a public way after dark without lights, in violation of Iowa Code § 321.384(1). Any traffic violation, however minor, provides probable cause for a traffic stop. *Hollins*, 685 F.3d at 705. Accordingly, the stop of Defendant's vehicle was not violative of the Fourth Amendment.

### B. Reasonable Suspicion

Because the officers had probable cause to believe a traffic violation had occurred, it is not necessary to address the Government's alternative argument that there was reasonable suspicion to believe the vehicle was being operated by an unlicensed driver. Nonetheless, the Court concludes the vehicle stop was also authorized on that ground.

Officer Vandekrol established that the registered owner of the vehicle had a "surrendered" license. That is, Vandekrol had reason to believe that the registered owner was not licensed to operate a motor vehicle in the state of Iowa. Assuming the registered owner — a female — was driving the vehicle, Vandekrol instructed Officers Bengston and O'Keefe to stop the vehicle. Both Vandekrol and O'Keefe credibly testified that they did not know the gender of the driver until after the vehicle was stopped.

---

[5] Government's Supplemental Brief (docket number 27) at 3.

7

The Court asked counsel to brief the issue of whether an officer has reasonable suspicion to believe that a crime is being committed if he observes a vehicle being operated, when he knows the registered owner of the vehicle is not licensed to drive in this state and is unaware the vehicle is not being driven by the registered owner. Counsel have not cited any Eighth Circuit cases on this point, and the Court has found none. However, the Government points the Court's attention to *State v. Vance*, 790 N.W.2d 775 (Iowa 2010).

In *Vance*, the officer's attention was drawn to a vehicle whose registered owner, a female, had her license suspended. The officer followed the vehicle and, despite being unable to see who was operating the vehicle, decided to initiate a traffic stop. It was only after the officer exited his patrol car and approached the vehicle that "he was able to observe for the first time that the vehicle's only occupant was a male driver." *Id.* at 778. Following a search of the vehicle, the driver was charged with possession of precursors with the intent to manufacture a controlled substance. The defendant claimed that "reasonable suspicion did not support the investigatory stop of the vehicle because the stopping officer merely knew the registered owner of the vehicle had a suspended driver's license but had no information about the identity of the driver." *Id.* at 781. The Iowa Supreme Court rejected the argument, finding there was reasonable suspicion to stop the vehicle.

> We hold an officer has reasonable suspicion to initiate an investigatory stop of a vehicle to investigate whether the driver has a valid driver's license when the officer knows the registered owner of the vehicle has a suspended license, and the officer is unaware of any evidence or circumstances indicating the registered owner is not the driver of the vehicle.

*Vance*, 790 N.W.2d at 781. The Court found it was reasonable for an officer to infer that the registered owner of a vehicle "will do the vast amount of the driving," and that forbidding police from relying on such an inference "would seriously limit an officer's ability to investigate suspension violations because there are few, if any, additional steps

the officer can utilize to establish the driver of a vehicle is its registered owner." *Id.* The Court concluded that "a majority of those jurisdictions [that have considered this issue] have adopted the standard we approve today." *Id.* at 782-83 (collecting cases).

While there is apparently no Eighth Circuit case on point, other circuit courts of appeal have reached a similar conclusion. *See, e.g., United States v. Cortez-Galaviz*, 495 F.3d 1203, 1207 (10th Cir. 2007) ("[C]ommon sense and ordinary experience suggest that a vehicle's owner is, while surely not always, very often the driver of his or her own car."); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) (finding probable cause to believe a traffic violation had occurred when the registered owner of a vehicle had a suspended license, and the driver of the vehicle matched the registered owner's description); *United States v. McBrown*, 149 F.3d 1176, *10 (5th Cir. 1998) (unpublished) (reasonable suspicion existed to stop a vehicle when the registered owner had a warrant for his arrest, and the officer did not know that the driver was not the owner of the vehicle).

Defendant argues that this case is different, because the Iowa Code does not speak to a "surrendered" license. Iowa law provides, however, that "[a] person, except those expressly exempted, shall not operate any motor vehicle upon a highway in this state unless the person has a driver's license issued by the department valid for the vehicle's operation." Iowa Code § 321.174(1). While the record is imprecise regarding the nature of a "surrendered license," it presumably means, at the least, the person does not have a valid driver's license in Iowa. Accordingly, the Court finds no substantive difference for these purposes between a suspended license and a surrendered license.

An officer cannot stop a motor vehicle based on a "mere hunch." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). The Fourth Amendment is satisfied, however, if the officer has "reasonable suspicion" to believe that criminal activity may be afoot. "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying

a preponderance of the evidence standard." *Id.* Recognizing that the concept of reasonable suspicion is "somewhat abstract," the United States Supreme Court has "deliberately avoided reducing it to 'a neat set of legal rules.'" *Id.* (quoting *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996)).

As the Court stated in *Hollins*, reasonable suspicion exists when the officer is aware of "particularized, objective facts" which, taken together with "rational inferences," reasonably warrant suspicion that a crime is being committed. 685 F.3d at 706. Here, the officers knew that the registered owner of the vehicle did not have a valid license to drive in the state of Iowa. While there are certainly exceptions, it can be rationally inferred that the driver of the vehicle is its registered owner, unless an officer is aware of evidence to the contrary. *Arvizu*, 534 U.S. at 277 ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."). Here, the officers credibly testified that they did not know the gender of the driver, which was different from that of the registered owner, until after the vehicle had been stopped. When the registered owner of a vehicle does not have a valid license, and when the officer is unaware of any evidence or circumstances indicating that the registered owner is not the driver of the vehicle, then there is reasonable suspicion to initiate an investigatory stop of the vehicle without offending the Fourth Amendment.

## VI. RECOMMENDATION

For the reasons set forth above, it is respectfully recommended that the Court **DENY** the Motion to Suppress (docket number 16) filed by the Defendant. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections."*

*Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on January 17, 2013.*

DATED this 25th day of January, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA